AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By:     JESSICA FEINSTEIN
        Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-1946

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
                            Plaintiff,                  :
                                                        :   VERIFIED COMPLAINT FOR
            -v.-                                        :   FORFEITURE
                                                        :
                                                        :   21 Civ. ___ (___)
                                                        :
A 10th CENTURY CAMBODIAN SANDSTONE                      :
SCULPTURE DEPICTING SKANDA ON A                         :
PEACOCK,                                                :
                                                        :
                            Defendant in Rem.           :
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney Audrey Strauss, United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1.      This action is brought by the United States of America seeking forfeiture of all right, title and interest in a sandstone statue, circa 10th Century A.D., depicting the Hindu deity Skanda riding a peacock, which was illicitly removed from the Prasat Krachap temple at

the historic and archeological site of Koh Ker, Preah Vihear Province, Cambodia (the "Defendant in rem"). A photograph of the Defendant in rem is attached hereto as Exhibit A.

2. The current owner of the Defendant in rem (the "Owner") has voluntarily relinquished possession of the Defendant in rem to the United States of America, and waives all claims of right, title and interest in the Defendant in rem. The Defendant in rem is currently located in the possession of the Department of Homeland Security, New York, New York.

3. The Defendant in rem is subject to forfeiture pursuant to 19 U.S.C. § 1595a(c) because there is probable cause to believe that the Defendant in rem is stolen property introduced into the United States contrary to law. The Defendant in rem is also subject to forfeiture pursuant to 18 U.S.C. § 545 because there is probable cause to believe that the Defendant in rem is merchandise which has knowingly been brought into the United States contrary to law. The Defendant in rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) because there is probable cause to believe that the Defendant in rem is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2314.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

5. Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b) because the Defendant in rem was found in the Southern District of New York.

## III. FACTUAL BACKGROUND

### The Ancient History of Koh Ker

6. Koh Ker, known in ancient times as Chok Garygar, was the capital of the ancient Khmer Empire from 928 to 944 A.D. It is located in the Kulen district of northern

Cambodia, approximately seventy-five miles northeast of the town of Siem Riep and the Angkor Wat temple complex. The Angkor region served as the capital of the Khmer Empire from in or about the 9th Century through the 15th Century, with the exception of the short period of time when Koh Ker was the capital. Following the sacking of Angkor by Siamese forces in 1431 A.D., the capital was moved to the Phnom Penh region, and the shrinking Khmer state came to be known as the Kingdom of Cambodia.

7. The Koh Ker site is of great significance from a religious, historical, and artistic perspective. Founded and built over a period of two decades by Jayavarman IV, a king of tremendous wealth and power, the Koh Ker site is a vast complex of sacred monuments made of brick, laterite, or sandstone, including, among other things, dozens of temples and sanctuaries, a huge terraced pyramid-temple known as Prasat Thom, and towers.

8. These structures, including a temple known as Prasat Krachap, described below, were built by the Cambodian state under Jayavarman IV and were the property of the Cambodian state. The Cambodian state has never transferred Koh Ker or the Prasat Krachap temple to any private owner, whether by sale, gift or otherwise.

9. The architecture and statuary of Koh Ker were executed, under the demands of Jayavarman IV, by the finest and most experienced artisans, sculptors, and craftsmen of the time. Koh Ker statuary, including the Defendant in rem, was revolutionary for its time. Many of the statues were huge, often shown in movement, and were free-standing or in high-relief, rather than simply in bas-relief.

## The Looting of Koh Ker

10. In the mid-to-late 1960's, Cambodia was plunged into political upheaval and civil war. The conflict pitted the Khmer Rouge and their allies, the North Vietnamese and

the Viet Cong, against the government forces of Cambodia, who were supported by the United States and South Vietnam.  In 1975, the government forces of Cambodia were defeated by the Khmer Rouge, and the Khmer Rouge controlled Cambodia between 1975 and 1979.  Millions of Cambodian citizens were killed during the period of Khmer Rouge control.

11. For the following nearly 20 years, during the 1980s and 1990s, Cambodia was beset by a civil war and there was looting at many sites, especially in areas of conflict. The Koh Ker site suffered serious damage and widespread looting.  This looting was widely publicized and well-known to participants in the international art market.

12. During this period, statues and other artifacts were stolen from Koh Ker and entered the international art market through an organized looting network. Local teams of looters would first remove the statues from their original location at Koh Ker.  The statues would then be transported to the Cambodia-Thailand border and brokers would transport them to dealers in Khmer artifacts. These dealers would sell the artifacts to local or international customers, who would either retain the pieces or resell them on the international art market.

13. One of the temples at Koh Ker is a structure called Prasat Krachap, also known as the "temple of inscriptions" for the inscribed writing in the stonework of the temple. In 2020, archeologists and researchers working under the auspices of the Cambodian Ministry of Culture and Fine Arts (the "Cambodian Ministry") began excavating Prasat Krachap. Based on the excavation of the site, which is still ongoing, archeologists believe that Prasat Krachap may be the royal family tomb for King Jayavarman IV or his son, Harshavarman II. Prasat Krachap was subject to widespread destruction and looting. As described below, the Defendant in rem was stolen from Prasat Krachap in or about September 1997.

**The Defendant in Rem**

14. The Defendant in rem is considered a masterpiece of Khmer art and a significant part of Cambodian cultural heritage. The sculpture depicts the Hindu god of war, Skanda, riding on the back of a peacock. The body and tail of the peacock are decorated with intricate engraved patterns. Skanda is rarely depicted in Cambodian art, but, as described below, appears to have featured prominently in Prasat Krachap temple. Khmer cultural experts believe that the face of Skanda on the Defendant in rem may in fact be a portrait of a royal family member, such as Harshavarman II, the son of King Jayavarman IV.

**The Theft of the Defendant in Rem**

15. Investigators working for the Cambodian Ministry and the United States Government have interviewed a Cambodian national who was previously engaged in the theft and looting of antiquities from Cambodian temples and archeological sites ("Looter-1"). Looter-1 has described and identified sculptures that Looter-1 helped to illicitly remove from archeological sites, including Koh Ker. The information Looter-1 has provided has been corroborated by, among other things, archeological evidence, photographs, and other individuals involved in looting. Looter-1 told investigators the following, in substance and in part:

    a. Looter-1 joined the Khmer Rouge at the age of approximately 10 years old. Looter-1's father became involved in the looting of temples, and Looter-1 began assisting him when Looter-1 was around 18 years old. From in or about the 1980s until the late 1990s, Looter-1 developed an expertise in the location, identification, and removal of Khmer cultural objects from various temples and other sites around Cambodia. By the 1990s, Looter-1 was leading a group of approximately 450 people working in multiple teams to loot temples and archeological sites, including Koh Ker.

b.     Looter-1 sent many of the Khmer cultural objects that Looter-1 looted from Koh Ker to one of three brokers in antiquities who lived close to the Thai border (including "Broker-1" and "Broker-2"). Looter-1 was aware that Broker-1 and Broker-2 sold antiquities to a man whom Looter-1 knew as "Sia Ford,"[1] a foreign national with a large collection of Khmer antiquities in Bangkok, Thailand. Looter-1 never personally met "Sia Ford." As described below, however, the man known as "Sia Ford" was Douglas Latchford, a/k/a "Pakpong Kriangsak."

c.     In or about September 1997, Looter-1 lead a team of people that looted Prasat Krachap temple at Koh Ker.   Another team, led by Broker-1, conducted further looting later that year.   The teams led by Looter-1 and Broker-1 discovered and removed approximately twelve large, culturally significant statues from Prasat Krachap.

d.     One evening in approximately September 1997, Looter-1 and another team member located the Defendant in rem under dirt in the antechamber of Prasat Krachap. The same day, Looter-1 also found a large sculpture depicting Skanda and Shiva ("Skanda and Shiva") in the antechamber of Prasat Krachap.

e.     Looter-1's team removed the Defendant in rem, Skanda and Shiva, and other statues from Prasat Krachap and transported them over several days by oxcart to Broker-2's truck, and ultimately to Broker-2's house near the border of Thailand. Each member of Looter-1's team was paid approximately 15,000 Thai Bhat in exchange for the statues removed from Prasat Krachap.

---

[1] "Sia" is a Thai word for "lord," and often used to refer to a wealthy business person.

16. In or about October 2020, as part of the Cambodian Ministry-led excavation of Prasat Krachap, Looter-1 accompanied representatives of the Cambodian Ministry to the Prasat Krachap archeological site. Looter-1 showed the archeologists exactly where Looter-1 discovered the Defendant in rem and Skanda and Shiva. Digging where Looter-1 indicated, the archeologists located a previously unknown antechamber floor, including the outlines of the bases of several large statues.

17. In or about November 2020, the archeologists excavating Prasat Krachap located pieces of a roof pediment. Once reassembled, the pediment shows the image of what appears to be Skanda on one side. The depiction of Skanda in the pediment at Prasat Krachap is further evidence that the Defendant in rem came from the same temple.

18. In or about July 2021, representatives of the Cambodian Ministry met with Broker-1. Broker-1 confirmed, in substance and in part, the following:

   a. Broker-1 had brokered the sale of Khmer sculptures and antiquities on behalf of Looter-1.

   b. Broker-1 assisted in the looting of Prasat Krachap. Broker-1 recognized the Defendant in rem as a sculpture that Looter-1 discovered at Prasat Krachap.

   c. Broker-1 sold sculptures to, among others, Douglas Latchford, who lived in Bangkok, Thailand. Broker-1 had visited Latchford's apartment in Bangkok, and identified a photograph of Latchford shown to Broker-1.

### The Sale of the Defendant in Rem

19. In October 2019, a grand jury in this District returned a sealed felony indictment charging Douglas Latchford, a/k/a "Pakpong Kriangsak," with wire fraud conspiracy and other crimes related to a many-year scheme to sell looted Cambodian antiquities on the international art market, primarily by creating false provenance documents and falsifying invoices and shipping documents, including misrepresentations of the country of origin of artworks. *See United States v. Latchford*, 19 Cr. 748 (AT) (the "Indictment"). As set forth in the Indictment, Latchford was a prominent collector and dealer in Southeast Asian art and antiquities, who maintained residences in Bangkok and London. In September 2020, the Indictment was dismissed due to the death of Latchford.

20. In February 2021, the Cambodian Ministry announced that Latchford's family had agreed to return Latchford's large collection of Cambodian art to Cambodia. One of pieces the family has agreed to return to Cambodia is Skanda and Shiva, which Looter-1 removed from Prasat Krachap temple on the same day as the Defendant in rem. Skanda and Shiva was previously featured on the cover of *Adoration and Glory*, a book about Cambodian sculpture co-authored by Latchford, in which Skanda and Shiva is listed as belonging to a "Private collection." The Defendant in rem was also featured in *Adoration and Glory*, and listed as belonging to a "Private collection, New York."

21. On or about April 10, 2000, Latchford sold the Defendant in rem to a corporate entity controlled by a family member of Owner-1 (the "Prior Owner") for $1.5 million. Latchford provided the Prior Owner with an invoice for the Defendant in rem, describing the sculpture as "A 10th Century Stone Figure of Skanda Seated on a Peacock," in the "Style of Koh Ker," with the "Country of Origin" listed, falsely, as "Thailand." An airway bill indicates that the

Defendant in rem was shipped by Latchford from Singapore to London. At some point after its purchase in 2000, the Defendant in rem was shipped to New York, New York.

22. Owner-1 inherited the Defendant in rem from the Prior Owner. After Owner-1 was contacted by the United States of America regarding the Defendant in rem, Owner-1 agreed to relinquish possession of the Defendant in rem to the United States of America, and to waive all claims of right, title and interest in the Defendant in rem. The Defendant in rem is currently in the possession of the United States Department of Homeland Security.

### IV. CAMBODIA'S OWNERSHIP OF THE DEFENDANT IN REM

23. As set forth in paragraphs 6 through 22, the Defendant in rem was a monument built as part of the construction of Prasat Krachap temple in Koh Ker. Both Prasat Krachap, and the Defendant in rem as a component part of the temple, were the property of the Cambodian state which constructed them. Neither Koh Ker, Prasat Krachap, nor the Defendant in rem was ever transferred by the state to private ownership. Accordingly, the Defendant in rem remained the property of the Cambodian state in 1997, when it was stolen.

24. State ownership of Cambodian antiquities such as the Defendant in rem has also been established in various laws dating back to the French colonial era. In 1863, a treaty between France and the Kingdom of Cambodia established Cambodia as a protectorate of France. In 1884, the concept of private property was introduced through a convention imposed by the French administration.

25. Also in 1884, a ruling by the French Governor responsible for Cambodia granted the state all territory formerly held by the crown. While this 1884 ruling made select lands "alienable," the "public domain" remained "inalienable," including those "structures [...] assigned to a public service."

26. Subsequently, a 1900 decree established a baseline level of protection for art and archaeology in French Indochina, including Cambodia, and explicitly recognized that such items, including statues, that "exist on or in the soil" of immoveable properties that were part of the "national domain," were similarly part of the national domain. As Koh Ker and Prasat Krachap were part of the national domain, the Defendant in rem was therefore automatically part of the national domain under the 1900 decree.

27. The 1900 decree also established a system of classifying certain moveable and immoveable property, whose conservation was in the public interest from a historical or artistic perspective. Under the decree, once thus categorized, these moveables and immoveables received additional protections which, among other things, prohibited their unauthorized alteration, movement, sale, export, destruction, and even restoration. Furthermore, such property was "inalienable" and "imprescriptible," under penalty of any sale's nullification. Subsequent legislation in 1913 and a decree issued in 1924 reaffirmed the protections set forth in the 1900 decree.

28. In or about 1925, the classification of French Indochina's objects and sites as historical monuments and objects began in earnest. This process further confirmed the state's ownership of the Defendant in rem. First, a May 6, 1925 decree reaffirmed that ownership of statues found on property belonging, *inter alia*, to the Cambodian state, now referred to as the "colonial" rather than "national" domain, was retained by the state. Second, on May 16, 1925, another decree classified Koh Ker as a historical monument of French Indochina, confirming its status as part of the colonial domain. Subsequently, a July 1925 decree, among other things, reiterated the earlier protections regarding classification and

expanded upon them.   The July 1925 decree also criminalized violations of the law related to historical monuments and objects.

29. On May 6, 1947, with independence on the horizon for Cambodia, the King of Cambodia signed a new constitution.   In addition to laying the groundwork for the modern Cambodian state, this charter provided that existing laws "not inconsistent" with its terms "shall remain in force," until replaced by new ones or otherwise repealed.   In a 1950 convention, France transferred the power to protect, classify, and conserve historic monuments to the Royal Government of Cambodia.   Cambodia formally declared and was granted independence in 1953.

30. In the 1960's, Cambodia joined other states in calling for an international agreement to regulate the looting of archeological sites and the subsequent trafficking in antiquities.   Most of the supporters for such a treaty were former European colonies in Asia and Africa which, like Cambodia, feared that these activities were chipping away at their very national identities.   Their efforts culminated in the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural Property.

31. In September 1972, Cambodia became only the seventh state to ratify the UNESCO Convention, even though by then the government controlled little more than the Phnom Penh and Angkor regions.   Just a few months earlier, Cambodia had also imposed a new constitution, which established the short-lived Khmer Republic.   Like its 1947 predecessor, this document contained a provision that preserved the previous government's institutions, until a new framework could be implemented.

32. Looting of items from sites such as Prasat Krachap was punished as theft until the civil war degraded the government's control over the country. Most famously, in 1924 two Frenchmen, Georges (André) Malraux and Louis Chevasson were prosecuted and convicted for theft for taking eleven sculptures from a temple in the Angkor region, "to the prejudice of the State." The court ordered the sculptures returned "to their rightful owner," and they were turned over to the colonial government's Angkor Conservancy, reflecting that such sculptures were the property of the state.

33. Since the end of the civil war, the Cambodian government has sought the return of artifacts looted from its temples and archeological sites during or after the civil war.

34. State ownership of the Defendant in rem is further confirmed by the 1996 Law on the Protection of Cultural Heritage, enacted the year before the theft. An English-language version of the 1996 Law is attached hereto as Exhibit B (hereinafter referred to as the "1996 Law"). The 1996 Law was enacted with the purpose of protecting Cambodian national cultural heritage and cultural property against, among other things, excavation, alienation, and exportation. It defines "cultural property" as "any work produced by human agency and any natural phenomenon of a scientific, artistic or religious nature which bears witness to a certain age in the development of civilization . . . and whose protection is in the public interest." 1996 Law, Art. 4. In particular, the 1996 Law prohibits excavation or exportation of cultural property without prior authorization of the state, *see id.*, Art. 40, 51, and declares that "[m]oveable cultural property found by chance is public property." *Id.*, Art. 39.

## V. CLAIMS FOR FORFEITURE

35.     Incorporated herein are the allegations contained in paragraphs 1 through 34 of the verified complaint.

36.     18 U.S.C. § 545 provides in pertinent part that "[w]hoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law," shall be subject to criminal penalties.   18 U.S.C. § 545 further provides in pertinent part that "[m]erchandise introduced into the United States in violation of this section . . . shall be forfeited to the United States."

37.     18 U.S.C. § 2314 provides in pertinent part that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, the value of $5,000 of more, knowing the same to have been stolen, converted or taken by fraud," shall be subject to criminal penalties.

38.     19 U.S.C. § 1595a(c) provides in pertinent part:

> Merchandise which is introduced or attempted to be introduced
> into the United States contrary to law shall be treated as follows:
> (1) The merchandise shall be seized and forfeited if it – (A) is
> stolen, smuggled, or clandestinely imported or introduced. . . .

30.     Pursuant to 18 U.S.C. § 981(a)(1)(c), "any property, real or personal, which constitutes or is derived from proceeds traceable," to a violation of 18 U.S.C. § 2314 is subject to forfeiture to the United States.

31.     The Defendant in rem is subject to forfeiture pursuant to 18 U.S.C. §§ 545, 2314, and 19 U.S.C. § 1595a(c) because there is probable cause to believe that the

Defendant in rem is stolen property introduced into the United States contrary to law.

33. The Defendant in rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) because there is probable cause to believe that the Defendant in rem is property, real or personal, which constitutes or is derived from a violation of 18 U.S.C. § 2314.

Dated:   New York, New York
         July 15, 2021

AUDREY STRAUSS
United States Attorney for
the Southern District of New York
Attorney for the Plaintiff
United States of America

By: *Jessica K. Feinstein*
JESSICA FEINSTEIN
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1946

# VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

       JOHN P. LABBAT, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
JOHN P. LABBAT
Special Agent
Homeland Security Investigations

Executed on this
14 day of July 2021